*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-AA-369

BLAKE J. NELSON, *et al*., PETITIONERS,

v.

DISTRICT OF COLUMBIA RENTAL HOUSING COMMISSION, RESPONDENT,

and

THE KLINGLE CORPORATION, *et al*., INTERVENORS.

On Petition for Review of a Decision and Order
of the District of Columbia Rental Housing Commission
(TP-28,519)

(Argued April 24, 2018                              Decided May 24, 2018)

*Blake J. Nelson*, with whom *Carol S. Blumenthal* was on the brief, for petitioners.

*Jason Lederstein*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General at the time the brief was filed, and *Loren L. AliKhan*, Deputy Solicitor General at the time the brief was filed, were on the brief, for respondent.

*Richard W. Luchs*, with whom *Debra F. Leege* was on the brief, for intervenors.

Before FISHER and THOMPSON, *Associate Judges*, and FARRELL, *Senior Judge*.

FISHER, *Associate Judge*: Blake and Wendy Nelson filed a petition with the Rent Administrator alleging that their housing providers charged rent above the lawful rent ceiling. The petition eventually reached the Rental Housing Commission ("the Commission") and it held that the rent was too high but awarded the Nelsons less relief than they sought. Now, they contend that the Commission shortchanged them and raise four challenges to its ruling. We find none persuasive and affirm.

## I. Background

On August 1, 2003, the Nelsons moved into unit 802 in the Kennedy-Warren, a residential apartment complex owned by the Klingle Corporation and managed by B.F. Saul Property Company (collectively, "intervenors"). Their petition, filed on January 26, 2006, alleged that intervenors miscalculated the rent ceiling for their unit and charged rent above the lawful level. Specifically, they averred that intervenors failed to perfect a 2003 vacancy adjustment and CPI-W (or cost-of-living) adjustments in 2003, 2004, and 2005.[1]

---

[1] Before 2006, the Rental Housing Act prohibited regulated housing providers from charging rent above lawful rent ceilings. D.C. Code § 42-3502.06 (a) (2001). To increase the rent ceiling through a CPI-W or vacancy adjustment, housing providers needed to "take and perfect" the adjustment by filing with the

(continued…)

The hearing examiner generally agreed with these arguments. In a proposed order, he held that the 2003 vacancy adjustment and 2003–2005 CPI-W adjustments were invalid, deducted those increases, and determined that the lawful rent ceiling was $1,766 per month. Noting that intervenors had sought rent above that level—they initially demanded $3,225 per month for the Nelsons' unit and raised that figure to $3,349 and eventually $3,439—the hearing examiner awarded the Nelsons a refund, with interest, for rent charged above the lawful maximum.

Before the hearing examiner converted that order into a final one, the Nelsons and intervenors filed briefs presenting exceptions and objections to the proposed order. The Nelsons argued that the hearing examiner erred in concluding that intervenors did not act in bad faith, a holding that made the Nelsons ineligible for trebled damages. They also contended that he incorrectly calculated their rent

(…continued)
Rent Administrator and serving on the affected tenants a certificate of election. 14 DCMR §§ 4204.10, 4207.5. If a housing provider failed to do so, it failed to perfect the rent ceiling adjustment and could not rely on it to increase the rent charged. *Sawyer Prop. Mgmt. of Md., Inc. v. District of Columbia Rental Hous. Comm'n*, 877 A.2d 96, 100 (D.C. 2005). The District of Columbia abolished rent ceilings in 2006; however, because the Nelsons filed their petition before August 6, 2006, the effective date of that amendment, the rent ceiling regime still governs this case. *See* D.C. Code § 42-3502.06 (a) (2012 Repl.).

refund and, finally, moved to reopen the hearing so that they could submit additional evidence. The hearing examiner rejected all of these arguments, as well as those raised by intervenors, and made only minor changes to the proposed order.

Both parties then sought review by the Commission, which affirmed most of the hearing examiner's holdings. In the one reversal relevant here, the Commission held that, contrary to the hearing examiner's determination, intervenors owed the Nelsons prejudgment interest through the date of the *final*, rather than *proposed*, order at a rate of three, rather than four, percent. Rather than remand, the Commission awarded the Nelsons the corrected interest amount. After the Commission rejected their motion for reconsideration of this issue, the Nelsons filed this petition for review.

## II. Analysis

This court will accept the Commission's findings of fact if substantial evidence on the record supports them. *Loney v. District of Columbia Rental Hous. Comm'n*, 11 A.3d 753, 755 (D.C. 2010). As to questions of law, we remain "the final arbiter" but will defer to the Commission's interpretation of "the statutes it administers and the regulations it promulgates" unless its interpretation "is

unreasonable or embodies a material misconception of the law." *Sawyer Prop. Mgmt. of Md., Inc. v. District of Columbia Rental Hous. Comm'n*, 877 A.2d 96, 102–03 (D.C. 2005) (internal quotation marks and citation omitted).

### III. The Commission Properly Calculated the Nelsons' Rent Refund

### A. The CPI-W Increases from 1987 to 2002

The Nelsons argue that the Commission incorrectly calculated their refund because it erroneously interpreted the Rental Housing Act's statute of limitations. The Act provides in relevant part that "[n]o petition may be filed with respect to any rent adjustment . . . more than 3 years after the effective date of the adjustment." D.C. Code § 42-3502.06 (e) (2012 Repl.). In their primary argument, the Nelsons interpret this provision to give tenants three years from their first rent bill to challenge the entire basis of that initial charge. This approach would allow the Nelsons to contest every rent ceiling adjustment intervenors ever imposed on their unit—including the ones from 1987 to 2002, which the Nelsons allege intervenors filed improperly. The Commission, by contrast, concluded that the Nelsons could not challenge rent or rent ceiling adjustments with effective dates more than three years prior to their petition, regardless of when the

adjustment first affected them. This holding precluded the Nelsons from contesting any rent or rent ceiling increase before the 2003 CPI-W adjustment.

The Commission's interpretation is consistent with its precedent and ours. In *Kennedy v. District of Columbia Rental Hous. Comm'n*, we affirmed the Commission's view that the statute of limitations bars challenges to "adjustments in either the rent levels or rent ceilings . . . in place more than three years prior to the date of the filing of a tenant petition." 709 A.2d 94, 97 (D.C. 1998). While the Commission applied this rule, the Nelsons offered an incompatible interpretation— one that would start the limitations period on the date a rent adjustment first affects a particular tenant, rather than the effective date of the increase.

Attempting to distinguish *Kennedy*, the Nelsons note that, unlike the tenants in that case, who challenged inaccurate *calculations* of rent ceiling adjustments, they contest improperly *filed* rent ceiling adjustments. As the Commission recognized, this distinction is immaterial: both arguments constitute merits challenges to the adjustments and the statute of limitations exists to preclude merits arguments, no matter their basis.[2] *See Majerle Mgmt., Inc. v. District of Columbia*

---

[2] Observing that, in certain instances, the *Kennedy* rule will allow the statutory period to expire before a rent or rent ceiling adjustment ever affects the

(continued…)

*Rental Hous. Comm'n*, 866 A.2d 41, 43, 46–48 (D.C. 2004) (observing that, absent unique circumstances, *Kennedy* rule would apply to petition challenging improperly filed and implemented rent ceiling adjustment).

## B. The 2002 CPI-W Increase

The Nelsons' alternative interpretation of the statute of limitations focuses on a $5 portion of the 2002 CPI-W increase. The 2002 adjustment, which occurred on a date beyond the statutory period, raised the *rent ceiling* on the unit from $1,710 to $1,766 but the intervenors only raised the *rent* to $1,761. Then, on a date within the limitations period, intervenors again raised the rent and the Nelsons assert that the $5 left over from the 2002 CPI-W adjustment was included in that

---

(…continued)
petitioning tenant, the Nelsons contend that our approach deprives tenants of the "reasonable time" to file their claims that due process requires. This argument overlooks a key fact: even if the petitioners could not have challenged adjustments established before they moved in, the prior occupants of their unit would have had an opportunity to do so. Thus, the Nelsons essentially argue that due process requires prolonging the statute of limitations so successors in interest can litigate claims that their predecessors failed to pursue. They cite no authority for this sweeping proposition and, as a result, we decline to rely on it to reconsider settled precedent.

increase.[3] They contend that D.C. Code § 42-3502.06 (e) allows them to contest this $5 portion of the 2002 CPI-W adjustment.

To reach this conclusion, the Nelsons cite *United Dominion Mgmt. v. District of Columbia Rental Hous. Comm'n*, 101 A.3d 426 (D.C. 2014). There we held that when a housing provider has not properly perfected a rent ceiling adjustment, the statutory period for contesting it begins when the housing provider "implement[s]" the adjustment by using it as a basis to raise a unit's rent. *Id.* at 427. Based on this holding, the Nelsons essentially argue as follows: when intervenors raised the rent to $1,761, they "implemented" *that portion* of the 2002 CPI-W adjustment. Tenants had three years from the date of implementation to contest it. However, the other $5 portion of the 2002 CPI-W rent ceiling adjustment remained "unimplemented," and the statutory period for challenging it did not begin, until intervenors (supposedly) incorporated it in the large 2003 rent increase. In other words, the Nelsons claim they were entitled to five extra dollars a month.

---

[3] Specifically, intervenors increased the rent ceiling to $3,225 and raised the rent to that amount. The Nelsons assert that the $5 portion of the 2002 CPI-W adjustment served as one of several bases for raising the rent charged.

We reject this interpretation of *United Dominion*, which seems to ignore the well-established distinction between the rent ceiling and the amount of rent charged. That case in no way suggested that a rent ceiling adjustment is implemented in stages, as the rent increases, and can be challenged multiple times.[4] Rather, we stated that a rent ceiling adjustment "is implemented through a corresponding increase in the rent charged." *Id.* Here, the "corresponding increase" occurred when intervenors relied on the 2002 CPI-W adjustment to raise the rent above the old ceiling of $1,710. At that point, intervenors gave effect to the new rent ceiling of $1,766 even if they did not raise the rent as high as the new ceiling would allow. As *United Dominion* explained, this act triggered the statute of limitations for contesting the adjustment.

The Nelsons attempt to defend their interpretation by referencing 14 DCMR § 4205.9 (permitting housing providers to "implement[] less than the full amount

---

[4] Moreover, the Nelsons' reading of *United Dominion* is in tension with the purpose of D.C. Code § 42-3502.06 (e). Before that provision, every new rent charge restarted the statutory period for challenging all prior rent ceiling adjustments. *Kennedy*, 709 A.2d at 96. The legislature enacted § 42-3502.06 (e) to abolish that regime and ensure that the period for contesting a given rent ceiling adjustment did not constantly renew. *Kennedy*, 709 A.2d at 96–97. The Nelsons' position, however, would restart the clock for contesting a rent ceiling adjustment each time a housing provider raised the rent underneath that ceiling. This result would undermine the principle that tenants have one three-year period for challenging a given rent ceiling increase.

of any rent ceiling adjustment") and § 4205.10 ("Any rent ceiling adjustment, or portion thereof, which remains unimplemented shall not expire and shall not be deemed forfeited."). It no doubt can be confusing that these regulations, which were adopted long before *United Dominion* was decided, use various forms of the verb "implement." Properly understood, however, they do not mean that the statute of limitations permits a rent ceiling to be attacked each time the rent is increased beneath it.

The Nelsons' argument misconstrues the whole series of regulations in Chapter 4205, which deals with increases and decreases in rent. (A separate chapter, 4204, deals with adjustments in rent ceilings.) These regulations expressly recognize that the rent ceiling is not the same thing as the rent charged. Moreover, they allow housing providers to raise the rent in increments. *See* § 4205.2 (The housing provider "may implement a rent increase to an amount equal to, or less than, the authorized rent ceiling."); § 4205.3 ("A housing provider may charge as rent for a rental unit an amount less than the authorized rent ceiling without waiving or forfeiting the right to later implement a rent increase."). Seen in this context, the regulations cited by petitioners simply reassure housing providers that they will not forfeit the right ultimately to charge rent at the ceiling by raising the rent in more modest increments.

In sum, the Commission properly applied the statute of limitations to the circumstances presented here. We discern no error in its ruling that the old rent ceiling was $1,766, not $1,761.[5]

## IV. Other Arguments

### A. Prejudgment Interest

Next, the Nelsons raise two challenges to the award of prejudgment interest. Both contest the Commission's interpretation of regulations promulgated under the Rental Housing Act—14 DCMR §§ 3826.2 and 3826.3. *See* 14 DCMR § 3800 ("Unless otherwise noted, the authority for the chapter is . . . the 'Rental Housing Act of 1985.'"). As stated, we will affirm the Commission's interpretation of such regulations unless it is "plainly wrong" or embodies a "material misconception of

---

[5] The Nelsons also argue that the Commission should have calculated the refund through October 2012 because, in that month, intervenors allegedly made a judicial admission that they still intended to collect illegal rent. The Commission, instead, awarded rent through the date of the last evidentiary hearing. We have affirmed the Commission's practice of terminating refunds on that date, even when a housing provider subsequently demands allegedly unlawful rent. *See Levy v. District of Columbia Rental Hous. Comm'n*, 126 A.3d 684, 692 (D.C. 2015).

law." *Sawyer*, 877 A.2d at 102–03 (internal citation and quotation marks omitted).[6]

The Nelsons first argue that the Commission was "plainly wrong" to conclude that § 3826.3 establishes a single, fixed prejudgment interest rate rather than a fluctuating one. We discern no error in the Commission's interpretation. Section 3826.3 ties the prejudgment interest rate to the one used by the Superior Court "pursuant to D.C. Official Code § 28-3302 (c) (2001), on the *date of the decision*." (Emphasis added.) The Commission held that the italicized phrase required the interest rate to remain fixed at the level in place on a particular day— "the date of the decision." Although the Nelsons make several arguments in favor of a floating rate, their contentions do not demonstrate that the Commission's holding, which comports with the plain text of the regulation as well as the Commission's past interpretations of it, *see, e.g.*, *Rittenhouse LLC v. Campbell*, TP

---

[6] In light of the Nelsons' assertions to the contrary, we emphasize that this deferential standard of review applies here. This court defers to the Commission's interpretation of the regulations it promulgates, such as §§ 3826.2–.3. *See Sawyer*, 877 A.2d at 102. Moreover, the method of calculating prejudgment interest relates to the administration of the Rental Housing Act's remedial scheme, a matter that falls within the Commission's sphere of authority. *See* D.C. Code § 42-3502.02 (a)(1) (2012 Repl.) (authorizing Commission to issue "rules and procedures for the administration of this chapter"). Separately, we note that because we affirm the award of prejudgment interest on the merits, we do not consider the contention of the government and intervenors that the Nelsons should be judicially estopped from challenging it.

25,093 2002 D.C. Rental Housing Comm. LEXIS 582 (RHC Dec. 17, 2002), was unreasonable.

In what appears to be a counterintuitive fallback argument, the Nelsons contend that the Commission erred in holding that prejudgment interest runs from the date of the injury until the date of the hearing examiner's *final*, rather than *proposed*, decision. Although this argument would shorten the prejudgment period, the Nelsons apparently believe that it would increase their overall award because the Superior Court's interest rate was higher on the date of the proposed order than on the date of the final one. Once again, the Nelsons have failed to show that the Commission's interpretation was unreasonable.[7]

---

[7] This interpretation does not conflict with *Johnathan Woodner Co. v. Enobakhare*, TP 27,730 2011 D.C. Rental Housing Comm. LEXIS 24 (RHC Sept. 7, 2011). There, the Commission treated the "date of the decision" for purposes of calculating interest as March 2, 2007, when the hearing examiner issued an order titled "*Proposed* Decision and Order." (Emphasis added.) However, the Commission simply *assumed* that the March 2 order was the relevant one (perhaps because the hearing examiner did not issue a subsequent decision). The Commission did not address the issue raised here—whether the regulations refer to the final or proposed order. *See id*; *see also Levy*, 126 A.3d at 690 ("[S]tare decisis is never properly invoked unless in the decision put forward as precedent the judicial mind has been applied to and passed upon the precise question.") (alteration in original) (internal quotation marks and citation omitted).

## B. Bad Faith

Housing providers demonstrate "bad faith" under the Rental Housing Act if they betray "an intent . . . to misrepresent." *Bernstein Mgmt. Corp. v. District of Columbia Rental Hous. Comm'n*, 952 A.2d 190, 198 (D.C. 2008). Contrary to the Nelsons' assertions, both the hearing examiner and the Commission applied this standard or one substantially similar to it. Both found that intervenors did not act with the prohibited intent, a conclusion that is supported by substantial evidence. Specifically, the hearing examiner credited the testimony of Tanya Marhefka, the general manager of the Kennedy-Warren, who stated that tenants could inspect forms related to past rent ceiling adjustments (namely, "registration documents . . . [and] certificate[s] of election") in the Kennedy-Warren's business office. The hearing examiner also found that intervenors served the certificates of election for the CPI-W increases on the Nelsons (albeit belatedly), thereby informing tenants of their intent to establish the adjustments and their basis for doing so. Based on the record presented, the Commission reasonably affirmed the hearing examiner's conclusion that intervenors sought to disclose their conduct, rather than deceive their tenants.[8]

---

[8] The Nelsons complain that the Commission erred by relying upon the testimony of David Newcome, vice president of B.F. Saul Property Company, as

(continued…)

The Nelsons counter that the Commission erred by ignoring six issues that provided additional reasons for finding bad faith. In their notice of appeal before the Commission, the Nelsons raised these issues as alternative bases for invalidating the 2003 vacancy adjustment. The Commission properly deemed these issues moot because, once it voided that adjustment on other grounds, it had granted the Nelsons the relief they sought. *See Fraternal Order of Police, Metro. Labor Comm. v. District of Columbia*, 82 A.3d 803, 813 (D.C. 2014) (case moot if requested relief "unnecessary"). The Nelsons also mentioned some of these issues as reasons why substantial evidence demonstrated that intervenors acted in bad faith. Although the Commission did not analyze the nuances of every argument the Nelsons made in their twenty-page discussion of bad faith, it observed that if substantial evidence supports the hearing examiner's decision then "substantial evidence to the contrary does not permit the Commission to overturn" it. Thus, the Commission did not *ignore* the six issues the Nelsons highlight; rather, it properly

---

(…continued)

well as certain statements by Ms. Marhefka. However, the Commission referred to this testimony by way of example and there was a solid foundation for the hearing examiner's conclusion that intervenors did not act in bad faith. Under these circumstances we need not address the Nelsons' arguments in detail because, on this record, we are satisfied that any error by the Commission was harmless. *See generally Kotteakos v. United States*, 328 U.S. 750 (1946).

held that those issues did not justify reversing the hearing examiner's holding that intervenors did not act in bad faith.[9]

## C. Reopening the Hearing

The Nelsons' first basis for reopening the hearing concerns the hearing examiner's decision to take official notice of a document in the Rent Administrator's "registration file" for their unit. This act, the Nelsons contend, entitled them to submit other documents from that file—specifically certificates of election for CPI-W increases from 1987–2000 that intervenors allegedly filed late. The Nelsons base this argument on D.C. Code § 2-509 (b) (2012 Repl.), which states that if an agency decision "rests on official notice of a material fact not appearing in evidence in the record, any party to such case shall on timely request be afforded an opportunity to show the contrary." Here, however, none of the agency's holdings rested on official notice of facts outside the record. Although the hearing examiner did rely on one document in the registration file to conclude

---

[9] We also disagree with the Nelsons' argument that the hearing examiner deserved less deference because his proposed order "copied" portions of intervenors' "Summary of Testimony." The Commission found no evidence that the hearing examiner failed to "appropriately consider the respective proposed decisions and orders from the Housing Provider and the Tenants." This conclusion accurately characterizes the record, and, consequently, the Commission was not required to apply heightened scrutiny to the hearing examiner's orders.

that intervenors properly registered their building, the Acting Rent Administrator retracted this determination from the final order upon realizing that the parties had not put that issue into dispute. Thus, § 2-509 (b) does not provide a basis for the Nelsons to add the certificates.

Second, the Nelsons assert that they should have had an opportunity to present "newly discovered" evidence, including tenant petitions, witness affidavits, and recordings of other Rental Housing Commission hearings. Contrary to the Nelsons' arguments before this court, both the hearing examiner and the Commission properly evaluated this argument based on whether the Nelsons exercised "due diligence" in attempting to acquire this evidence before the hearing.[10] Substantial evidence supported the Commission's determination that the Nelsons failed to satisfy this standard. The Nelsons justify their delay by noting

---

[10] Contrary to the Nelsons' assertions, the fact that their evidence was intended to rebut allegedly dishonest testimony did not entitle them to a more lenient due diligence test. *See, e.g.*, *Oxendine v. Merrell Dow Pharm., Inc.*, 563 A.2d 330, 334–35 (D.C. 1989) (applying standard due diligence analysis to newly discovered evidence of false testimony). Nor do we agree with the Nelsons' contention that the Commission should have applied the due diligence standard less stringently because they were contesting a proposed, rather than final, order. Courts and other tribunals value finality not simply to bring matters to a close, but also to avoid needless delays and waste of resources. Reopening the hearing in this case two years after it had ended would have wasted resources and needlessly delayed the agency's decision.

that their evidence responded to statements made by witnesses during the hearing that they could not have anticipated. Yet this rationale does not explain the Nelsons' failure to ask that the record remain open so that they could secure additional evidence.[11] Nor does it justify their decision not to file their motion to reopen until *two years* after the hearing ended.

## V. Conclusion

For the reasons stated, the Commission's order is

*Affirmed.*

---

[11] The Nelsons argue that they did, in fact, make such a request. However, they cite nothing in the record that supports this assertion.